<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| COREY FALLEN and SHANTELL FALLEN, | Case No. 15cv2286 (EP) (JBC) |
| Plaintiffs, | **OPINION** |
| v. |  |
| CITY OF NEWARK, *et al.*, |  |
| Defendants. |  |

**PADIN, District Judge.**

This matter arises from the arrest, detention, and ultimate exoneration of Plaintiff Corey Fallen[1] related to the disappearance and murder of Denise Ramsey ("Victim").  Only three Defendants remain: New Jersey State Police Sergeant Thomas McEnroe ("McEnroe"), who has moved for summary judgment; and City of Newark Detective Joseph Hadley ("Hadley") and the City of Newark ("Newark"),[2] who have moved for summary judgment.  The Court decides both summary judgment motions on the papers pursuant to Fed. R. Civ. P. 78 and L.Civ.R.78.1(b).  For the reasons set forth below, both pending summary judgment motions will be **DENIED *in part*** and **GRANTED *in part***.

## I. BACKGROUND

### A. Factual Background

On January 25, 2012, McEnroe, a New Jersey State Police sergeant, was assigned to investigate the death of go-go dancer Denise Ramsey ("Victim").  *See* D.E. 169-1 ("Pl. CSTMT")

---

[1] Corey Fallen's wife, Shantell Fallen, is also a Plaintiff in this matter, however, unless otherwise noted, references to "Plaintiff" are to Corey Fallen.

[2] Hadley and Newark are collectively referred to as "Newark Defendants."

¶ 3; D.E. 148-4 ("EC Cont. Rpt.") at 6, 17.  At all relevant times, McEnroe was assigned to the Essex County Prosecutor's Office ("Prosecutor's Office"), and was the lead detective on the Victim's case.  *See* D.E. 169-4 ("McEnroe Dep.") at 95:16-96:16, 314:4-315:3.  Hadley, a Newark detective, was also assigned to the Essex County Prosecutor's Office, but his involvement with the Victim's case consisted of showing the six-photo lineup (inclusive of Plaintiff's photo) to a witness, travelling to Georgia with McEnroe to collect Plaintiff's DNA buccal swab, in September 2012, travelling to Georgia with McEnroe to arrest Plaintiff in October 2012, and travelling to Georgia with McEnroe to investigate Plaintiff's alibi in April 2013.[3]  *See* McEnroe Dep. at 122:5-10; D.E. 169-20.

The Victim was last seen alive in the late hours of December 2, 2011, and into the early hours of December 3, 2011 at The Doll House, where she worked, in Irvington, New Jersey.  Pl. CSTMT ¶ 2; EC Cont. Rpt. at 17.  The Victim's sister reported her missing on January 5, 2012. EC Cont. Rpt. at 17.  Her body was discovered under a mattress in an empty lot in East Orange, New Jersey.  *Id.* at 6, 8.  The Victim's body was decomposed, had multiple stab wounds, and was wrapped in a blue fitted bed sheet and gray sweatshirt.  *Id.* at 10-11, 13-14.

Upon investigation, McEnroe learned that the Victim was last seen leaving The Doll House with two Black males ("Suspects"), who were ultimately identified as John Bernard Jones ("Jones") and Brian Love ("Love").  Pl. CSTMT ¶ 2.  McEnroe proceeded to interview five witnesses from The Doll House that had seen the Suspects; however, only two witnesses provided physical descriptions of the Suspects.

On January 26, 2012, McEnroe interviewed Gary Capone ("Capone"), the general manager at The Doll House, who provided the following descriptions of the Suspects: "[o]ne of them was

---

[3] Beyond this, the parties dispute Hadley's level of involvement.

a black male approximately [] 6 foot, in his early to mid-30s, and the other one was a black male, approximately in his late [] 20s, early 30s, approximately my height, 5 foot 8[,]" D.E. 169-5 at 6:14-18; "[t]he first guy [6' male], [] he was built strong, and the second guy [5'8" male] was [] a little pudgy…," *id.* at 6:21-24.  Capone also told McEnroe that one of the Suspects was "gloating" about "beat[ing] a murder charge," the night of the Victim's disappearance.  *Id.* at 6.  When asked whether he would be able to identify the Suspects, Capone expressed uncertainty, stating, "I possibly might be able to able to do that, yes."  *Id.*

On February 1, 2012, McEnroe interviewed Erica Hamilton ("Hamilton"), an employee at The Doll House, who provided the following descriptions of the Suspects: one of the Suspects identified himself as "Big Red," and was "approximately 6'01" [tall], light skinned, gold teeth, pointy nose, slim, with a country accent," and "having just beaten [a] murder charge[;]" one of the Suspects identified himself as "Joe," and was "dark skinned, wide nose[d], country accent, 5'09" to 5'11 tall, cocky, thick build, no gold teeth, and with some sort of tattoo or mark on the back of his head with a star that may have said Joe or Big Joe."  EC Cont. Rpt. at 25-26.  Hamilton also stated that the Suspects were involved in a confrontation about missing money with the Victim. *Id.* at 26.   Additionally, Hamilton told McEnroe that the Victim left The Doll House with the Suspects—"the two guys from Atlanta"—driving off in a black car.  *Id.*

The other three witnesses[4] that McEnroe interviewed recalled, on the night that the Victim was last seen at The Doll House, that there had been a dispute between the Victim and the Suspects "from Atlanta" concerning missing money.  *See id.* at 28.

---

[4] Florian Barthelus, owner of The Doll House; Anthony Christie, an employee at The Doll House; and Jasmine Jones ("Jasmine"), an employee at The Doll House.  *Id.* at 28, 30.

On February 1, 2012, McEnroe contacted Detective Brett Zimbreck, from the Georgia Police Department Homicide Unit in Atlanta, and detailed his investigation. *Id.* at 27. Zimbreck advised McEnroe, in 2011, that there had been two homicide acquittals in Atlanta. *Id.* Zimbreck then provided McEnroe with photos and identifiers, *i.e.*, height and weight, of Corey Davis and Plaintiff. *See id.*; McEnroe Dep. at 247:17-20. Plaintiff's identifiers indicated that he was a 5'5"[5] light-skinned Black male. McEnroe Dep. at 251:2-4, 252:10-16. Comparing Plaintiff's identifiers to the physical descriptions of the Suspects, he was light-skinned like "Big Red," but was at least six inches shorter.

In March 2012, McEnroe was able to identify Jones as "Joe," one of the Suspects, through cellphone data obtained through communications data warrants, which showed communications between the Victim and Jones on the night she disappeared, EC Cont. Rpt. at 36-37, and that Jones stayed in a hotel near Newark Liberty International Airport in the days following the Victim's disappearance, *id.* at 37, 40. McEnroe also learned from these warrants that 114 cellphone communications had been recorded between Jones and Love. *Id.* at 43.

On March 28, 2012, McEnroe interviewed four additional persons, who confirmed that Jones and Love had lived together in an apartment in East Orange, New Jersey, before leaving for Atlanta, Georgia. *See id.* at 45-48, 50-51. R.L. Bailey, Jones and Love's landlord, described them as "nasty people, the whole crew, they left the place a mess," and stated, in December 2011, that Jones and Love left in a hurry back to Atlanta, Georgia. *Id.* at 46-47. Based on this information, McEnroe obtained a search warrant for Jones and Love's apartment, ultimately collecting the following items: a skirt sheet, two shoeboxes containing paperwork and documents, and a blood swab. *Id.* at 49-50.

---

[5] Sources in the record differ between 5'5" and 5'6".

On May 7, 2012, McEnroe obtained two additional communications data warrants for Jones and Love's cellphones. *Id.* at 52. The record does not include any indication that Plaintiff's cellphone communications were reviewed.

On June 13, 2012, McEnroe sought and received information concerning Plaintiff from the Fulton County Sherriff's Office, in Georgia; the information included Plaintiff's height—5'6"—and weight—150 pounds—, Plaintiff's photo—taken three weeks before the Victim's disappearance—, his cellphone number, and his driver's license history. D.E. 169-8. Again, comparing Plaintiff's identifiers to the Suspects' physical descriptions, he was light-skinned like "Big Red," but was over six inches shorter.

On June 15, 2012, McEnroe met with, and reinterviewed, Capone. *Id.* at 52-53. Capone told McEnroe that the Suspects had been openly "boasting about beating a murder rap," the night of the Victim's disappearance. D.E. 169-19 at 5-6. Detective Iemmello then showed Capone two six-pack photo lineups, which omitted the height and weight criteria. One of the photo lineups included a black-and-white photo of Plaintiff listed as "Number 3." *See generally id.*; D.E. 169-18. In the first photo lineup, Capone identified "Number 3," Plaintiff, and, in the second photo lineup, he identified "Number 4," Jones, as the Suspects. *See* D.E. 169-19 at 17, 21, 25, 27. Following Capone's identification, McEnroe reentered the room and showed Capone the two photos he had identified. *Id.* at 24-25. With respect to Plaintiff's photo, Capone added, "I do need to mention at the time [of the Victim's disappearance] his hair was not like that." *Id.* at 25. Capone did not provide a Statement of Certainty. *See generally id.*

On August 8, 2012, McEnroe met with, and reinterviewed, Jasmine. EC Cont. Rpt. at 56. Jasmine told McEnroe, on the night of the Victim's disappearance, that the Suspects "spen[t] a lot of money," "were from Atlanta," announced that "they beat a murder trial," and that the Victim

left with the Suspects.  D.E. 169-20 at 4-5, 7, 11.  She also described one of the Suspects, "Joe," as, "short, dark, [and] a little chubby," *id.* at 5, and the other as, "[t]all, skinny, [and] light-skinned," *id.* at 10.  Hadley then showed Jasmine two six-pack photo lineups, which omitted the height and weight criterion.  One of the photo lineups included a photo of Plaintiff listed as "Number 3."  *See generally id.*  In the first photo lineup, Jasmine identified "Number 3," Plaintiff, and in the second photo lineup, she identified, "Number 4," Jones, as the Suspects.  *See* D.E. 169-20 at 13-20.  Following Jasmine's identification, McEnroe reentered the room and showed Jasmine the two photos she had identified.  *Id.* at 20-23.  Jasmine provided a Statement of Certainty, however, in connection with her identification of Plaintiff, she also made statements of uncertainty, *i.e.*, "[h]e was at my job.  Well, supposed to be in the case.  I don't know…."  *Id.* at 15.

On September 25, 2012, McEnroe obtained search warrants to collect DNA buccal samples from Plaintiff and Jones.  *See generally* D.E. 169-22; EC Cont. Rpt. at 59-60.  McEnroe and Hadley travelled to Georgia to execute the search warrants.  *See* EC Cont. Rpt. at 60.  On September 27, 2012, McEnroe and Hadley[6] executed the two search warrants, collecting DNA buccal swabs from Plaintiff and Jones.  *Id.* at 61-63.  During McEnroe and Hadley's encounter with Plaintiff, he stated, "I never been to New Jersey, I don't even know where it is."  *Id.* at 63.

On October 22, 2012, McEnroe obtained the DNA results.  The results showed that DNA recovered from the Victim's sweatshirt and fingernails matched Jones's DNA.  *Id.* at 65-66.  The results also showed that Plaintiff's DNA did not match any DNA recovered from the Victim.  *Id.* at 66 ("Mr. Fallen was excluded as a contributor to any of these DNA profiles."); *see also generally* D.E. 169-23.  That same day, McEnroe submitted affidavits, requesting arrest warrants for both

---

[6] Along with a local investigator named David H. White.  EC Cont. Rpt. at 60.

Jones and Plaintiff.[7]  EC Cont. Rpt. at 66.  The affidavit submitted for Plaintiff's arrest did not mention that the DNA results had excluded him as a suspect.[8]  Both arrest warrants were issued.

On October 24, 2012, McEnroe and Hadley travelled to Georgia to execute the two arrest warrants.  *Id.* at 67.  McEnroe and Hadley[9] went to Jones's residence to execute his arrest warrant, but he was not there.  *Id.*  Instead, they spoke with Love, who was arrested by local authorities on drug-related charges.  *Id.*  The parties dispute whether Love confessed to his involvement in the Victim's disappearance and murder at this time or months later.

That same day, McEnroe and Hadley,[10] attempted to execute Plaintiff's arrest warrant, but he was not at his residence.  *Id.* at 68.  Instead, they spoke with Plaintiff's mother, who stated that Plaintiff had told her that he had never been to New Jersey.  *Id.*  That afternoon, Plaintiff's attorney informed McEnroe that Plaintiff would turn himself in the next day.  *Id.* at 69.  McEnroe and Hadley left Georgia without speaking to Plaintiff.  *See id.*  Plaintiff turned himself into local authorities the next day and was processed for extradition to New Jersey.  *Id.* at 70.

On April 4, 2013, after Plaintiff had already been in jail for months, McEnroe and Hadley began reviewing Plaintiff's work records and affidavits related to his whereabouts at the time of the Victim's disappearance and murder.  *Id.* at 71.  McEnroe and Hadley found that these records and affidavits supported Plaintiff's assertion that he was not in New Jersey at the time of the Victim's disappearance and murder.  *Id.*  McEnroe and Hadley were assigned to travel back to Georgia to further corroborate their findings.  *Id.*

---

[7] For conspiracy to commit murder as to Plaintiff.
[8] McEnroe's affidavit concerning Plaintiff is laid out in fully in Section III.
[9] Along with White.
[10] Along with White.

On April 17, 2013, through interviews, video evidence, and payroll records, McEnroe and Hadley corroborated that Plaintiff was working in Georgia at the time of the Victim's disappearance and murder.  *Id.* at 71-76.

On April 29, 2013, Love's DNA, which was obtained voluntarily, was found to be a match with DNA recovered from the Victim.  *Id.* at 78-80.

On May 23, 2013, Love and Jones were identified in six-pack photo lineups shown to Donald Patterson, a disc jockey at The Doll House who observed the Suspects.  *Id.* at 82.  On January 27, 2014, McEnroe and Hadley travelled back to Georgia to execute Love's arrest warrant. *Id.* at 83-85.  Love detailed that he and Jones were involved in the Victim's disappearance and murder.  *Id.* at 85-88.  He made no mention of Plaintiff.

After nearly six months in jail, Plaintiff was ultimately exonerated and released.

**B.  Procedural Background**

On September 14, 2014, Plaintiff filed this matter against several Defendants, including McEnroe, Hadley, and Newark, in Georgia.  D.E. 1, Ex. A.  Defendants removed this matter to the Northern District of Georgia, which subsequently granted McEnroe and Hadley's transfer motion to the District of New Jersey, on March 31, 2015.  *See* D.E. 29.  On July 22, 2015, Plaintiff filed a First Amended Complaint ("FAC").  D.E. 53.  Defendants moved to dismiss the FAC, D.E. 60. On January 24, 2017, the Court (Cecchi, J.) dismissed certain claims and Defendants.  D.E. 84.

On April 1 and 2, 2022, the remaining Defendants, McEnroe, Hadley, and Newark,  moved for summary judgment on the operative 12-count FAC.  D.E. 148-1 ("McEnroe Mot."); D.E. 149-25 ("Newark Mot.").  Plaintiff opposed both.  D.E. 170 ("McEnroe Opp'n"); D.E. 169 ("Newark Opp'n").  Defendants replied.  D.E. 167 ("McEnroe Reply"); D.E. 166 ("Newark Reply").  Being fully-briefed, the Court decides both summary judgment motions.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 136, 145-46 (3d Cir. 2004).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment.  *See id*.  The movant must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).

Once the movant has adequately supported its motion, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  The nonmovant must identify specific facts and affirmative evidence that contradict the movant.  *Anderson*, 477 U.S. at 250.  The nonmovant "cannot create an issue of fact merely by [] denying averments [] without producing any support evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted).  Where the nonmovant's "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).  But "[i]f reasonable minds could differ as to the import of the evidence," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the [nonmovant's] evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A. Threshold Issues

#### 1. *Section 1983*

Several of Plaintiff's constitutional claims are cognizable only when brought pursuant to 42 U.S.C. § 1983. *See Fields v. City of Salem Police Dep't*, 2015 U.S. Dist. LEXIS 108635, at *8-9 (D.N.J. Aug. 17, 2015) ("[The p]laintiff, however, cannot assert claims for relief under the United States Constitution directly and must utilize the vehicle of a claim under [Section] 1983.") (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906-07 (3d Cir. 1997)). Thus, the Court will clarify which claims will be construed pursuant to Section 1983.

Section 1983 provides a private cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 48 (1988). In and of itself, Section 1983 is not a source of substantive rights but provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotation marks omitted). A plaintiff seeking recovery under Section 1983 "must show two elements: (1) a person deprived him or caused him to be deprived of a right secured by the [C]onstitution or laws of the

United States, and (2) the deprivation was done under color of law." *Henning v. Twp. of Blairstown*, 2010 U.S. Dist. LEXIS 52754, at *11 (D.N.J. May 28, 2010) (citing *West*, 487 U.S. at 48; *Sample v. Diecks*, 885 F.2d 1099, 1107 (3d Cir. 1989)).

Here, Plaintiff asserts several Fourth Amendment violations, properly labeling certain claims as Section 1983 claims, but failing to label other claims as Section 1983 claims in the FAC. Specifically, Count II – Unreasonable Search and Seizure and Count III – Unlawful Detention, which Plaintiff labels as "U.S. Constitution" claims in the FAC, are cognizable under Section 1983 because they allege that Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. *See* U.S. CONST. amend. IV; *Boyd v. Hudson Cnty. Prosecutor's Off.*, 2014 U.S. Dist. LEXIS 1723, at *15-16 (D.N.J. Jan. 6, 2014) (citing *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268-69 (3d Cir. 2000) ("[The plaintiff's] first three claims of false arrest/false imprisonment, malicious prosecution, and unlawful seizure are cognizable under [Section] 1983 because they are, in effect, allegations that the detectives and other state officials violated his Fourth Amendment rights by arresting, seizing, restraining, and prosecuting him without probable cause.")).  Thus, Counts II and III will be interpreted pursuant to Section 1983.

Moreover, because the New Jersey Civil Rights Act ("NJCRA") was modeled after Section 1983 and is interpreted analogously therewith, Count X – Violation of the NJCRA will be, to the extent possible, addressed concurrently with the Section 1983 claims.[11] *See, e.g.*, *Geissler v. City of Atl. City*, 198 F. Supp. 3d 389, 394 (D.N.J. 2016) (citations omitted); *Estate of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 245 n.4 (3d Cir. 2016) (holding that "it appears undisputed that [the p]laintiffs' claims under the New Jersey Constitution and the [NJCRA] trigger the same legal elements and principles as…[the] federal causes of action [under Section 1983]");

---

[11] The Court will note when the NJCRA and Section 1983 claims are being analyzed separately.

*Wang v. N.J. State Police*, 2019 U.S. Dist. LEXIS 139809, at \*15 (D.N.J. Aug. 19, 2019) ("[T]he analysis for [the p]laintiffs' New Jersey [c]onstitutional malicious prosecution claim is the same as the [Section] 1983 analysis.").

Additionally, while Count VIII – Negligent Hiring/Training/Retention in the FAC attempts to assert a Section 1983 claim against Newark, this is at bottom a common law tort claim.[12] *See Waselik v. Twp. of Sparta*, 2017 U.S. Dist. LEXIS 76646, at \*14 (D.N.J. May 18, 2017). The Court will analyze it as such. However, to the extent that Count VIII – Negligent Hiring/Training/Retention overlaps with Count I – Pattern and Practice Liability and Count VII – Supervisor Liability, it is superfluous. *See id.* at \*14 n.11. Consequently, any Section 1983 aspect of negligent hiring, training, or retention will be considered in connection with Counts I and VII. *See id.*

In summary, the FAC contains the following Section 1983 claims: Count I – Pattern and Practice Liability, Count II – Unreasonable Search and Seizure, Count III – Unlawful Detention, Count IV – False Arrest/Imprisonment, Count V – Malicious Prosecution, Count VI – Conspiracy,[13] and Count VII – Supervisor Liability.

*2. Proper Defendants*

Certain claims Plaintiff advances against Newark under Section 1983 must be dismissed as they are not cognizable when brought against municipalities. Specifically, Count II –

---

[12] The parties fail to clearly distinguish between Counts I, VII, and VIII in their briefs.

[13] Labeled only as a Section 1985 claim, but as the Court (Cecchi, J.) previously recognized, Plaintiff intended to refer to Section 1983, not Section 1985. *See Fallen v. City of Newark*, 2017 U.S. Dist. LEXIS 10433, at \*13 (D.N.J. Jan. 24, 2017) ("Plaintiffs respond that reference to [Section] 1985 was a mistake and the Amended Complaint was intended to refer to [Section] 1983."). However, because the Court (Cecchi, J.) concluded that Plaintiff had sufficiently pled both a Section 1983 and a Section 1985 conspiracy claim, this Court will entertain the parties' arguments as to both types of conspiracy claims. *See id.* at \*13.

Unreasonable Search and Seizure, Count III – Unlawful Detention, Count V – Malicious Prosecution, and Count VI – Conspiracy, and Count X – NJCRA[14] cannot proceed against Newark. *See Caban v. City of Newark*, 2018 U.S. Dist. LEXIS 89533, at *12 (D.N.J. May 29, 2018). "While a municipality may be liable under Section 1983, it cannot be liable under a theory of *respondeat superior*." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "A municipality may only be held liable under Section 1983 if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Twp.*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. at 694). The same rule applies to any parallel claims brought under the NJCRA. *See* Caban, 2018 U.S. Dist. LEXIS 89533, at *16-17 (citing *Stomel v. City of Camden*, 192 N.J. 137, 145 (2007)). Therefore, the Court will only consider claims against Newark that can properly be asserted against a municipality.[15]

*3. New Jersey Tort Claims Act*

---

[14] To the extent that it supports state-based constitutional claims that run parallel to Count II, Count III, Count V, and Count VI.

[15] Newark properly raises, Newark Mot. at 38-39, and Plaintiff concedes, Newark Opp'n at 43, that Newark cannot be held vicariously liable under Section 1983.

To the extent that Plaintiff brings common law tort claims in parallel to Plaintiff's Section 1983 and NJCRA claims,[16] these claims must be dismissed for failure to comply with the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. 59:1-1, *et seq.*, which governs.[17]

The NJTCA provides that "[n]o action shall be brought against a public entity or public employee under [the NJTCA] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. 59:8-3. The NJTCA requires compliance with the following procedure:

> Prior to filing a complaint, a plaintiff must submit a notice of claim to the public entity within ninety days of the claim's accrual, N.J.S.A. 59:8-8(a), and must file suit within two years after the claim's accrual, N.J.S.A. 59:8-8(b).

*Id.* (citing *Velez v. City of Jersey City*, 180 N.J. 284, 290 (2004)). Under the NJTCA, a claim accrues as of "the date of the incident on which the tortious conduct took place." *Waselik*, 2017 U.S. Dist. LEXIS 76646, at *14-15 (citations omitted).

The following claims, to the extent they are asserted as common law tort claims, Count II – Unreasonable Search and Seizure, Count III – Unreasonable Detention, Count IV – False Arrest/False Imprisonment, Count V – Malicious Prosecution, and Count VI – Conspiracy are subject to the NJTCA's notice requirements. *See Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 174-75 (3d Cir. 2006) (noting NJTCA's notice provision applies to tort of civil conspiracy); *Teel v. Eliasen*, 2018 U.S. Dist. LEXIS 183853, at *8-9 (D.N.J. Oct. 26, 2018) (dismissing common law claims for malicious prosecution, false arrest, false imprisonment, and failure to train for failure to comply with the NJTCA).

---

[16] Count II – Unreasonable Search and Seizure, Count III – Unlawful Detention, Count IV – False Arrest/False Imprisonment, Count V – Malicious Prosecution, and Count VI – Conspiracy.
[17] The Court addresses Count VIII – Negligent Hiring/Training/Retention separately.

Defendants contend, and the record supports, that Plaintiff did not file a notice of claim for any common law tort claims. *See* Newark Mot. at 42;[18] McEnroe Mot. at 27; D.E. 148-5 (certification from Peter Ramos, who is responsible for custody of all notices of claim filed with the State of New Jersey, noting that no notices of claim have been filed by Plaintiff). The Court agrees. Plaintiff finds no support in the record to the contrary nor does he provide a justification for his failure to comply with the NJTCA's notice of claim requirement. Accordingly, summary judgment in Defendants' favor will be granted on Counts II through VI and X, but only to the extent that they assert common law tort claims.

### 4.  Duplicative Section 1983 Claims

Certain of Plaintiff's Section 1983 claims are duplicative.

Defendants have not argued that certain claims are substantively duplicative, but the Court may *sua sponte* dismiss claims where "the basis for dismissal is apparent from the face of the complaint[.]" *Fahnbulleh v. Steneck*, 2018 U.S. Dist. LEXIS 56581, at *30 (D.N.J. Apr. 3, 2018) (citation omitted). However, "[b]efore *sua sponte* dismissal is appropriate, [] a court must give the plaintiff notice and an opportunity to be heard on the legal viability of his complaint." *Id.* (citation omitted). For the reasons below, the Court provides notice to Plaintiff that it will dismiss Count II – Unreasonable Search and Seizure and Count III – Unlawful Detention absent any timely objection. *See id.*; *Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 319-20 (D.N.J. 2021) (giving notice that the court would grant summary judgment *sua sponte*, subject to any supplemental submission submitted by a party within 10 days); Fed. R. Civ. P. 56(f) ("After giving notice and reasonable time to respond, the court may: (1) grant summary judgment for a

---

[18] Hadley and Newark specifically state that Plaintiff ran out of time to file a notice of claim for any common law tort claims on September 10, 2013. Newark Mot. at 42.

nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").

The crux of Count II – Unreasonable Search and Seizure, Count III – Unlawful Detention, and Count IV – False Arrest/False Imprisonment is that Defendants' actions violated Plaintiff's Fourth[19] Amendment rights.  *See* FAC ¶¶ 116-202.  "The Fourth Amendment, which protects persons from 'unreasonable searches and seizures' prohibits false arrest, false imprisonment, illegal search and seizure and the use of excessive force."  *Roman v. City of Newark*, 2017 U.S. Dist. LEXIS 13991, at *6 (D.N.J. Jan. 30, 2017) (citing U.S. CONST. amend. IV; *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (noting that a claim for false arrest is subsumed by a claim for false imprisonment); *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

Here, as pled, Count II – Unreasonable Search and Seizure, Count III – Unlawful Detention, and Count IV – False Arrest/False Imprisonment of the FAC are substantively duplicative claims.  *See* FAC ¶¶ 131-163.  In fact, even the parties do not distinguish between these claims in their briefs.  False imprisonment[20] under the Fourth Amendment requires a showing that: (1) a plaintiff was detained; and (2) the detention was unlawful.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 682-83 (3d Cir. 2012); *see also Simmons v. Roxbury Police Dep't*, 2017 U.S. Dist. LEXIS 185854, at *13 (D.N.J. Nov. 9, 2017) (citation omitted) ("Detention is unlawful, for

---

[19] Plaintiff references both the Fourth and Fourteenth Amendments in his FAC, however, his federal claims are proper under the former, not the latter.  Specifically, Plaintiff references the Fourteenth Amendment in relation to Count III – Unlawful Detention, but the unlawful detention pled occurred in the context of Plaintiff's arrest, which means the claim is premised on the Fourth Amendment.  *See Abdul-Ahad v. Essex Cnty. Sherrif's Dep't*, 2021 U.S. Dist. LEXIS 168973, at *11 (D.N.J. Sept. 7, 2021) (citations omitted) (noting that an unlawful detention outside the context of an arrest may give rise to a false imprisonment claim premised on the Fourteenth Amendment, but an unlawful detention within the context of an arrest is premised on the Fourth Amendment).
[20] False arrest is subsumed into the false imprisonment claim.  *See Wallace*, 549 U.S. at 388.

purposes of a false imprisonment claim, if detention is without legal process."); *Gaskins v. 17 Officers*, 2009 U.S. Dist. LEXIS 112756, at *13 (D.N.J. Dec. 4, 2009) (quoting *O'Connor v. City of Phila.*, 233 F. App'x 161, 164 (3d Cir. 2007) ("[W]here the police lack probable cause to make an arrest, the arrestee has a claim under [Section] 1983 for false imprisonment based on a detention pursuant to that arrest.") (cleaned up). Thus, Count III – Unlawful Detention and Count IV – False Arrest/False Imprisonment, which are both premised on Plaintiff's detention without probable cause for conspiracy to murder, are substantively identical. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (where a police officer lacks probable cause to make an arrest, the arrestee has a Fourth Amendment claim under Section 1983 for false imprisonment based on a detention pursuant to that arrest).

Additionally, Count II – Unreasonable Search and Seizure is substantively duplicative of Count III – Unlawful Detention and Count IV – False Arrest/False Imprisonment. Specifically, while Count II is labeled "Unreasonable Search and Seizure," in substance, Plaintiff asserts a False Arrest/False Imprisonment claim. For example, Count II states "Defendants [] charging Mr. Fallen with committing crimes, entirely without probable cause, was unreasonable under the Fourth Amendment[,]" "Defendant[s] failed to intervene to stop Mr. Fallen's unlawful arrest or to stop Defendant McEnroe from applying for and/or receiving a warrant for Mr. Fallen's arrest, based upon false, inaccurate and misleading information…[,]" and "[b]y having Mr. Fallen illegally searched, detained, arrested and charged with committing crimes without probable cause or a valid warrant, Defendants [] deprived Mr. Fallen of his [constitutional] rights[.]" FAC ¶¶ 135-37. Thus, Count II – Unreasonable Search and Seizure pleads nothing beyond what is already pled in Count III – Unlawful Detention and Count IV – False Arrest/False Imprisonment, which are also duplicative of each other.

Accordingly, Counts II, III, and IV are substantively a single False Arrest/False Imprisonment claim. As such, absent any objection from Plaintiff within ten (10) days, the Court will dismiss Counts II and III against McEnroe and Hadley without further notice. Herein, the Court will address Count IV – False Arrest/False Imprisonment.

   5. *Municipal liability claims will be considered together*

In Count I – Pattern and Practice Liability and Count VII – Supervisor Liability, Plaintiff asserts alternative theories of municipal liability available under Section 1983 as two separate claims. Both claims are brought against Newark, a municipality.

To bring a claim against a municipality under Section 1983, a plaintiff must assert a cause of action under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). However, a Section 1983 claim against a municipality will lie only if the municipality had a "policy or custom" that brought about the constitutional injury. *Berg*, 219 F.3d at 275 (citation omitted). A subset of Section 1983 "policy or custom" claims that can be brought against a municipality are failure to train, failure to supervise, and failure to investigate claims. *See, e.g.*, *Estate of Roman*, 914 F.3d at 798 (citation omitted).

Here, despite their distinct labels, Plaintiff's municipal liability claims, Count I – Pattern and Practice Liability and Count VII – Supervisor Liability,[21] significantly overlap. *Compare* FAC ¶ 122 ("The City of Newark engaged in a policy, custom and practice of inadequate screening, hiring, retaining, training and supervising its employees, which was the moving force behind the violation of Mr. Fallen's constitutional rights described herein.") *with id.* ¶ 184 ("The failure of these Defendants to train, supervise, and discipline [the individual Defendants], amounted to gross negligence, deliberate indifference, reckless or intentional misconduct which directly caused the

---

[21] In substance, this is, a failure to supervise claim.

deprivations suffered by Plaintiff.").   Additionally, Plaintiff's briefs do not substantively distinguish between Count I versus Count VII.

What can be ascertained is that Plaintiff asserts three alternative theories of municipal liability: failure to train, failure to supervise, and failure to investigate.  *See* Newark Opp'n at 20-31.  All three theories are cognizable municipal liability claims under Section 1983.  Therefore, to the extent necessary, the Court will address each theory, but will consider Count I – Pattern and Practice Liability and Count VII – Supervisor Liability together.

### B.  Summary Judgment Will Be Denied on Counts IV-VI and X

McEnroe and Hadley are not entitled to summary judgment as to Count IV – False Arrest/Imprisonment, Count V – Malicious Prosecution, Count VI – Conspiracy, and Count X – Violation of the NJCRA.  These claims all hinge on whether Plaintiff's Fourth Amendment rights were violated.   A finding of probable cause provides a complete defense to claims asserting violations of the Fourth Amendment.[22]  This means that McEnroe and Hadley would be entitled to summary judgment on Counts IV through VI and X, if they could establish that probable cause existed to arrest, detain, and prosecute Plaintiff.  *See Castro v. New Jersey*, 521 F. Supp. 3d 509, 518 (D.N.J. 2021) ("The Third Circuit [has] set forth the law governing the analysis of probable cause in the context of summary judgment: The Fourth Amendment prohibits police from making an arrest except 'upon probable cause, supported by Oath or affirmation.'") (citing *Dempsey v. Bucknell University*, 834 F.3d 457, 467-68 (3d Cir. 2016)); *Dorval v. State*, 2021 U.S. Dist. LEXIS 13465, at *15 (D.N.J. Jan. 25, 2021) ("[T]he Third Circuit has held that the general right to be free

---

[22] Likewise, the presence of probable cause would also defeat state-based constitutional and tort claims, *i.e.*, under the NJCRA.  *Castillo-Perez v. City of Elizabeth*, 2014 U.S. Dist. LEXIS 55315, at *32 (D.N.J. Apr. 21, 2014) (citing *Revell v. Port Auth. of New York, New Jersey*, 598 F.3d 128, 137 n.16 (3d Cir. 2010)).

from arrest or prosecution absent probable cause was clearly established by 1994.") (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (arrest); *Groman*, 47 F.3d at 636 (imprisonment); *Gallo v. City of Phila.*, 161 F.3d 217, 220 n.4 (3d Cir. 1998) (prosecution)).  For the reasons outlined below, neither McEnroe nor Hadley has made this showing.

Significantly, "the question of probable cause in a [S]ection 1983 damage suit is [typically] one for the jury." *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)); *see also Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) ("Typically, the existence of probable cause in a [S]ection 1983 action is a question of fact."); *Castro*, 521 F. Supp. 3d at 519 ("There is a tension inherent in evaluating probable cause at the summary judgment stage."); *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 638 (D.N.J. 2011) (noting that probable cause is "a sufficiently fact-laden issue as to typically be a question for the jury").

Consequently, in this context, the applicable summary judgment standard requires that a district court "view all [] facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred," and "only then would the existence of conflicting evidence rise to the level of a 'genuine dispute as to any material fact' such that summary judgment would be inappropriate." *Castro*, 521 F. Supp. 3d at 519 (quoting *Dempsey*, 834 F.3d at 468).  This standard "must tolerate conflicting evidence to the extent it is permitted by the probable cause standard." *Id.* (quoting *Dempsey*, 834 F.3d at 468).  Here, this means that the viability of Counts IV through VI and X turns on whether probable cause existed to arrest Plaintiff for conspiracy to murder.

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  The probable cause analysis must be based upon the totality of the circumstances including "the objective facts available to the officers at the time of the arrest…." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (quoting *United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984), *cert. denied*, 471 U.S. 1018 (1985)).  In other words, if there "is a 'fair probability' that the person [has] committed the crime at issue," then probable cause exists.  *Wilson v. Russo*, 212 F.3d 781, 789-90 (3d Cir. 2000) (citing *Sherwood*, 113 F.3d at 401).

1. *Disputes of material fact concerning probable cause preclude summary judgment in McEnroe's favor*

McEnroe asserts that probable cause existed to arrest, detain, and prosecute Plaintiff because a judge, in reliance on McEnroe's affidavit, concluded there was probable cause to issue an arrest warrant.  McEnroe Mot. at 8-9.  However, "[a]n arrest warrant issued by a magistrate or judge does not, in itself, shield an officer from liability for false arrest[,]" if a plaintiff can establish by as preponderance of the evidence that probable cause was lacking.  *Ayala v. Randolph Twp.*, 2014 U.S. Dist. LEXIS 154213, at *15-16 (D.N.J. Oct. 30, 2014) (citing *Sherwood*, 113 F.3d at 399).

To demonstrate a lack of probable cause where an affiant, *i.e.*, detective or police officer, applies for and receives an arrest warrant by a judge, a plaintiff must demonstrate by a preponderance of the evidence: "(1) that the [affiant] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to

the finding of probable cause.'" *Wilson*, 212 F.3d at 786-87 (quoting *Sherwood*, 113 F.3d at 399);

*United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (same).

For the first step, the Third Circuit recognizes distinct standards for assertions and omissions. "An assertion is made with reckless disregard [for the truth] when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp* 46 F.3d 795, 801 n.6 (8th Cir. 1995)); *see also United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (noting that reckless disregard by assertion can be proven in two ways: "either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind"). Whereas an omission is made with reckless disregard for the truth if the affiant "withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 787 (*United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

Here, Plaintiff claims that the state judge's probable cause determination was based on McEnroe's affidavit, which contained forty-five assertions and reckless omissions of plainly exculpatory evidence. *See* McEnroe Opp'n at 13-20. The Court consolidates and summarizes these assertions and omissions, to the extent the record supports them, and indicates whether they would be the type of facts that would have raised serious doubts as to the assertions made or that a reasonable person would have known was of the kind that the judge would have wished to know:

> (1) **DNA Results.** DNA recovered from the Victim showed positive results for two male samples. DNA buccal swabs were performed on both Jones and Plaintiff. Jones's buccal swab demonstrated that his DNA matched one of the two male samples recovered from the Victim. EC Cont. Rpt. at 65-66. In contrast, Plaintiff's buccal swab demonstrated that his DNA did not match, but this information was

omitted from McEnroe's affidavit. *Id.* at 66 ("Mr. Fallen was excluded as a contributor to any of these DNA profiles."). McEnroe exhibited a reckless disregard for the truth by omitting the DNA evidence that excluded Plaintiff as a match for the DNA found on the Victim, because this is the type of fact that any reasonable person would have known is the kind of thing the judge issuing Plaintiff's arrest warrant would have wished to know. *See Burke v. Town of Walpole*, 405 F.3d 66, 84 (1st Cir. 2005) (finding that exculpatory DNA analysis known to at least one officer involved in the investigation was intentionally or recklessly withheld from the application seeking an arrest warrant, such that the plaintiff had proffered evidence sufficient to support a finding that he was arrested without probable cause).

(2) **Ties to New Jersey and Alibi.**  As early as September 27, 2012, when the DNA buccal swab was performed, Plaintiff informed McEnroe and Hadley that he had never been in or to New Jersey. EC Cont. Rpt. at 63.  McEnroe has confirmed that he could not place Plaintiff in New Jersey, aside from the two witness identifications that were made months after the Victim's disappearance and murder. *See* McEnroe Dep. at 210:24-211:5.  Plaintiff also informed McEnroe, Hadley, and White that he could not have gone to New Jersey because he works "all the time" and that this information could be verified by going to his workplace "around the corner."[23] D.E. 169-6 ("Pl. Dep.") at 33:22-34:23.  With the exception of one mention—"I've never been to New Jersey, I don't even know where that is"—McEnroe's affidavit omitted that only the two witness identifications, which were provided only after a significant timelapse, placed Plaintiff in New Jersey, and the affidavit entirely omitted Plaintiff's asserted alibi that he could not have been in New Jersey because he was working. D.E. 148-2.  When viewing the record in the light most favorable to Plaintiff, that McEnroe could not independently place Plaintiff in New Jersey would have raised serious doubts as to his assertion that Plaintiff was at The Doll House the night the Victim disappeared.  However, McEnroe's exclusion of Plaintiff's asserted alibi from his affidavit without more is not evidence of a reckless disregard for the truth because, an asserted alibi may be viewed as a "self-serving claim of innocence that 'd[oes] not [need] to be accepted at face value' by police or a neutral magistrate, and thus [is] not material." *See Tobal v. V.I. Police Dep't*, 2022 U.S. Dist. LEXIS 6767, at *45 (D.V.I. Jan. 13,

---

[23] The parties dispute whether Plaintiff said this.

2022) (citations omitted) (quoting *Porter v. Gray*, 2007 U.S. Dist. LEXIS 10143, at *53 (W.D. Pa. Feb. 13, 2007)).

(3) **Witness descriptions of "Big Red."**   Witnesses, Capone and Hamilton, described the second suspect,[24] "Big Red," as older, approximately 6' or 6'1" tall, "built strong," "stocky," "strong looking," "light skinned," "gold teeth, pointy nose, slim, with a country accent[,]" and as having "just beaten [a] murder charge." EC Cont. Rpt. at 26; D.E. 169-5 at 6-7.  In contrast, Plaintiff is about 5'5" tall, a fact omitted from McEnroe's affidavit, despite his acknowledgment that the height difference was significant. McEnroe Dep. at 251:2-4, 252:10-16.  The six-to-eight-inch height discrepancy between Plaintiff and the suspect that the witnesses described as "Big Red" is an exculpatory fact omitted from McEnroe's affidavit in reckless disregard for the truth because it is a fact that the judge would have wished to know.  *See Robinson v. Winslow Twp.*, 973 F. Supp. 461, 471 (D.N.J. 1997) (noting that most significant to its finding that a reasonable jury could find there was no probable cause to initiate criminal proceedings against the plaintiff was the fact that "the difference between the height of [the] plaintiff [5'5"] and the reported height of the assailant [between 5'10" and 6'2"] is so great that the police should have recognized immediately upon arresting [the] plaintiff that it was unlikely that he was the assailant for whom they were searching").

(4) **Capone's identification.**   Capone, a White male who claimed he observed the suspects at The Doll House, did not identify Plaintiff until 196 days after he purportedly observed him.  Capone only identified Plaintiff in a black-and-white photo lineup presented to him by Detective Iemello. EC Cont. Rpt. at 52-54.  Capone did not provide a Statement of Certainty regarding his identification of Plaintiff.   Additionally, upon identifying Plaintiff in the photo lineup, Capone stated that the light-skinned individual that he selected (Plaintiff) was the suspect that went into the DJ booth and bragged about "beating a murder rap," but months earlier, Capone stated that the dark-skinned individual (Jones) was the one who went into the DJ booth.  *Compare* D.E. 169-5 *with* D.E. 169-19.  In contrast, McEnroe's affidavit provided only that Capone identified Plaintiff in a photo lineup, but omitted the lengthy 196-day timelapse, the cross-racial black-and-white photo identification, the lack of Statement of Certainty, and that Capone contradicted his prior statement as to which of the two suspects went into the DJ booth, which, when viewed in the light most favorable to Plaintiff,

---

[24] Witness descriptions for the first suspect, "Joe," matched Jones's description.

24

may be facts that a reasonable person would believe a judge would wish to know. *See Yattoni v. Oakbrook Terrace*, 801 F. Supp. 140, 149 (N.D. Ill. 1992) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)) ("True enough, a delay of 'weeks or months between the crime and the viewing of the photograph' certainly tends to make an identification less reliable.").

(5) **Jasmine's identification.**   Jasmine, another witness who claimed she observed the suspects at The Doll House, did not identify Plaintiff until 250 days after she purportedly observed him.   She identified Plaintiff in a color photo lineup presented to her by Hadley.   EC Cont. Rpt. at 58-59.   She provided a Statement of Certainty that expressed uncertainty about her identification of Plaintiff.   D.E. 169-20.   In contrast, McEnroe's affidavit provided only that Jasmine identified Plaintiff in a photo lineup, but omitted the lengthy 250-day timelapse, and her lack of certainty as to the identification, which, when viewed in the light most favorable to Plaintiff, which may be facts that a reasonable person would believe a judge would wish to know.   *See Yattoni*, 801 F. Supp. at 149 (noting lengthy timelapse may reduce reliability).

(6) **Love.**   References to Love were largely omitted from McEnroe's affidavit, which Plaintiff asserts should have been included. However, "[a]n affidavit does not need to contain information about all suspects of an investigation."   *United States v. Carmen*, 2014 U.S. Dist. LEXIS 99937, at *16 (E.D. Wash. July 17, 2014) (citing *United States v. Wulferdinger*, 782 F.2d 1473 (9th Cir. 1986)). Thus, McEnroe's omission of the information of Love, which was not necessarily exculpatory of Plaintiff at the time, was not done made in reckless disregard of the truth.

(7) **Investigatory gaps.**   McEnroe's affidavit omits that he did not conduct or document any investigative activity related to Plaintiff after February 1, 2012 until June 13, 2012, when McEnroe obtained information from local authorities in Georgia concerning Plaintiff, including Plaintiff's height—5'6"—and weight—150 pounds—, Plaintiff's photo—taken three weeks before the Victim's disappearance—, his cellphone number, and his driver's license history.   D.E. 169-8.   Even viewing this four-month timelapse, in the light most favorable to Plaintiff, this fact is not exculpatory, because the length of an investigation does not necessarily weigh into the probable cause analysis.   However, the fact that McEnroe was aware that Plaintiff was at least six inches shorter than the light-skinned suspect, "Big Red," who he was painted to be, is a fact that a judge would want to know.

Having identified the relevant assertions and omissions in McEnroe's affidavit above, the Court proceeds with the second step of the probable cause analysis. At this step, courts "determine the materiality of the misstatements or omissions, excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at 789. Significantly, while "absolute inclusiveness is not required in order for an affidavit to pass constitutional muster, as '[a]ll storytelling involves an element of selectivity[,]' to ensure robust protection of the arrestee's Fourth Amendment rights, a 'police officer cannot make unilateral decisions about the materiality of information, or after satisfying…himself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Id.* at 787.

The Court must now "present a reconstructed affidavit that…includes [the] omitted evidence [and corrects misstatements made in the original affidavit]." *Newsome v. City of Newark*, 279 F. Supp. 3d 515, 533 (D.N.J. 2017). McEnroe's "corrected" warrant affidavit reads as follows:

> On Wednesday, January 25, 2012 at approximately 9:45 a.m., I, along with Detective Peter Cassidy, of the Essex County Prosecutors Office Homicide Task Force, were detailed by our lieutenant to an empty lot on South Ward Place, just west of North 15th Street in order to initiate an investigation into the body of a deceased female who had been discovered there by employees of the East Orange Department of Public Works. Upon our arrival, we observed the victim to be a black female lying upon her right side in the fetal position. She appeared to be wrapped in several pieces of clothing which did not appear to have been disturbed. Also recovered from the victim was a grey hooded sweatshirt, size 2XL, which appeared to have blood transfer on the front right sleeve, hood and rear of hood. The Medical Examiner was able to collect several hairs from within the hood. She was observed to have had her throat cut along with multiple stab wounds in the center of her chest. The presence of active maggots and larvae could be seen in the victim's neck and chest area. On Thursday, January 26th, 2012, I was contacted by Detective Robert Harris, Crime Scene Detective with the Essex County Prosecutors Office, and advised that the victim's

fingerprints came back as a positive identification for Denise Ramsey of 22 Hanford Place, Newark with a DOB of **[REDACTED]**.  Further investigation revealed that Ms. Ramsey had been reported missing to the Newark Police Department by her sister Arlene Ramsey on January 5, 2012.  I was able to locate Ms. Arlene Ramsey and notified her of the death of Denise Ramsey.  Ms. Arlene Ramsey advised me that her sister had been a "go-go" dancer and went by the stage name of "Pocahontas", she further advised that the last known place of employment for Ms. D. Ramsey was the Doll House located in Irvington, NJ.

Further investigation into Ms. Ramsey's employment status with the Doll House revealed that she had last worked there from the late night hours of December 2, 2011 into the early morning hours of December 3, 2011.

It was during this last shift that the decedent was introduced to ~~Mr. Fallen~~ **an individual who identified himself as "Big Red,"** and Mr. Jones, III and I learned that the parties had had a dispute over money. I was advised that the suspects had given Ms. Ramsey 3-one hundred dollar bills and had asked her to get them change in the form of singles.  Ms. Ramsey returned with change for 1-one hundred dollar bill.  The suspects became very angry and began to threaten Ms. Ramsey and the patrons.  One of the suspects was heard saying, "if we don't get the money, than we gonna go outside, pop the trunk and kill everybody in here."   In addition, one of them proceeded to enter the Disc Jockey booth and announced that they had just "beaten a murder rap" and demanded their money back.

**On January 26 and February 1, 2012, I interviewed five witnesses, who observed the suspects on the night Ms. Ramsey was last seen.  Gary Capone and Erica Hamilton provided physical descriptions of the two suspects.  They described "Big Red," as older, approximately 6' or 6'1' tall, "built strong," "stocky," "strong looking," "light skinned," "gold teeth, pointy nose, slim, with a country accent."**

Both suspects were later identified **via photograph** by: Mr. Alfolabi Babolola (identified suspect Jones **and Brian Love** as his upstairs neighbor**s**), Mr. R.L. Bailey (identified suspect Jones **and Brian Love** as ~~a~~ tenant**s** in the apartment that he owned and maintained), Ms. Tiesha Rollins (identified suspect Jones as her boyfriend with whom she was in regular telephone contact with until his sudden

departure to Georgia), Ms. Esther Wright (identified Johnny Jones, Jr. as suspect Jones' father who had a dating relationship with her sister, she also identified suspect Jones as the son and believed that he had been living with his father in East Orange since the summer of 2011),.

**One of the suspects** ~~Suspect Fallen~~ was heard by several witnesses bragging throughout the night that he had "beaten a murder rap." At one point he asked the DJ to announce to the patrons that he was celebrating because he had "just beaten a murder rap in Atlanta." He also made this announcement himself over the DJ's microphone when he was angry over his money being stolen.

**Further investigation revealed that Corey Alexis Fallen was one of two individuals that had "beaten a murder rap" in the city of Atlanta.** ~~Suspect Fallen's photo was placed in a 6-pack photo array and was subsequently identified as being in the company of Johnny Jones at the Doll House.~~ **On February 1, 2012, I obtained physical descriptors of Mr. Fallen from local authorities in Georgia. Mr. Fallen was described as 5'6" tall and his photo showed he was light-skinned. "Big Red," was described as light-skinned, but he was also described as being 6'0 or 6'1".**

**On June 15, 2012, 196 days after observing Ms. Ramsey with the suspects,** Mr. Gary A. Capone **was shown two six-pack photo arrays, one of which included a photo of Mr. Fallen and the other included a photo of Mr. Jones. He** (identified both **Mr. Fallen and Mr. Jones** as the men that were in the Doll House with the victim the night she disappeared**, however, no Statement of Certainty was obtained.**)**, and** **Mr. Capone stated that the dark-skinned individual (Mr. Jones) was the one who went into the DJ booth to brag about beating a murder rap, despite having said the opposite in his initial interview.**

**On August 8, 2012, 250 days after observing Ms. Ramsey with the suspects,** Ms. Jasmine Jones **was shown two six-pack photo arrays, one of which included a photo of Mr. Fallen and the other included a photo of Mr. Jones. She** (identified both Mr. Fallen and Mr. Jones ~~through a 6-pack photo array as being the men she last saw the victim with~~. **However, when she identified Mr. Fallen, Ms. Jones expressed a certain level of uncertainty— stating "I don't know" twice**)**.**

28

**When the two witnesses, Mr. Capone and Ms. Jones, identified Mr. Fallen via 6-pack photo array, neither was aware that Mr. Fallen was six-to-eight inches shorter than the suspect they previously described as "Big Red."**

**On the night of the victim's disappearance,** Suspect Jones was seen giving his cellular telephone number to the victim.  He also gave this number to Erica Hamilton and Jasmine Jones, also dancers at the Doll House.

Ms. Hamilton advised me that she had seen the victim leave the Doll House after her shift in the presence of the two suspects.  She observed the victim get into the suspects vehicle which she described as a black car, possibly an Infiniti.

The victim was never seen or heard from again after Ms. Hamilton made her observations.

The victim's body was finally located and recovered on January 25, 2012.

The animal activity on and inside of the victim's body indicates that she had been deceased for a significant period of time prior to the discovery of her body.

The victim's cell phone records indicate that she was no longer active on this phone after 2:30 a.m. on the morning of December 3rd, 2011.

An examination of the call detail records revealed suspect Jones to be in the area of the Doll House and the subsequent area where Ms. Ramsey's body was discovered in the early morning hours of December 3rd, 2011.

My investigation revealed that suspect Jones, III had been staying at the Howard Johnson hotel, located at 20 Frontage Road in Newark and within close proximity of Newark International Airport, rom December 4th, 2011 until December 8th, 2011.  The time period immediately after the victim went missing.

My investigation revealed that suspect Jones, III had been residing with his father at 110 Park Avenue, 2nd floor, in the city of East Orange from the summer of 2011 until the victim went missing.

My investigation revealed that immediately after December 3rd, 2011, suspect Jones, III, his father and his brother (Brian Love) left the apartment and returned to Georgia.  During an interview with the current owner of 110 Park Place, Mr. R.L. Bailey, he stated to me that "they wanted to get out of here in a hurry… They didn't pay rent or nothing."  He further stated that he had been in the apartment since the tenant's departure and that they had left some of their personal belongings behind in their rush to leave.

On September 27, 2012 I responded to the separate residences of Johnny Jones and Corey Fallen in Georgia for the purpose of executing an Order for a Buccal Swab of both of the suspects.  Upon advising Mr. Fallen as to the purpose of my visit he stated, in substance, "I've never been to New Jersey, I don't even know where that is."  **Aside from the two witness identifications of Mr. Fallen, my investigation did not find any other ties to New Jersey.**

On October 22, 2012, the NJ Forensic Science & Technology Center faxed a copy of a lab report to me at the Essex County Prosecutors Office.  This report indicates that Johnny B. Jones was the major contributor of DNA found within the sweatshirt wrapped around the body of Denise Ramsey and the minor contributor of DNA found under the fingernails of Ms. Ramsey.  **This report also excluded Corey Fallen as a contributor to the DNA found on or around the body of Ms. Ramsey.**

…

*See generally* McEnroe Aff.

Having reconstructed McEnroe's affidavit, the Court must weigh the inculpatory and exculpatory evidence in the "corrected" warrant affidavit to determine whether there was probable cause to arrest Plaintiff.  There was not.  McEnroe asserts that there was probable cause to arrest Plaintiff because: (1) two witnesses, Capone and Jasmine, identified Plaintiff in a photo lineup; (2) witness testimony provided that one of the two individuals was from Atlanta, Georgia, and bragged about "beating a murder rap," and Georgia law enforcement identified two individuals as having "beaten a murder rap[,]" including Plaintiff; (3) evidence implicating Jones "strengthened

suspicion against Jones as a perpetrator, and in turn strengthened suspicion against [Plaintiff] because he was identified as leaving the club with Jones and [the Victim] before she was killed[;]" and (4) that Jones's DNA was a match to DNA found on the Victim "enhanced the credibility of the identifications [of Plaintiff]." *See* McEnroe Mot. at 10-15.

Of these purported bases for probable cause, only the two witness identifications and the fact Plaintiff was only one of two individuals that had "beaten a murder rap" in Georgia, in 2011, weigh in favor of finding probable cause to arrest Plaintiff. However, while a "positive identification by a victim[25] witness, without more, would usually be sufficient to establish probable cause, this qualified precept cannot be rendered absolute." *Wilson*, 212 F.3d at 790. Specifically, "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known to the arresting officers could outweigh the identification such that probable cause would not exist." *Id.*

Here, there was independent exculpatory evidence and substantial evidence that Capone and Jasmine's identifications of Plaintiff were unreliable. First, McEnroe[26] was aware of the at least half-foot height difference between Plaintiff, who stood at approximately 5'5", and "Big Red," who witnesses observed to be between 6'0" and 6'1", when the photo lineups, omitting the height criterion, were shown to Capone and Jasmine. *See Wilson*, 212 F.3d at 790 (noting as an example of witness unreliability that "if two identifying witnesses had told the officer that the robber was 7', and the officer knew that the person in the photograph was 5', the positive identification would not be enough"); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993) (affirming denial of summary judgment were person arrested was six inches taller than the

---

[25] Here, neither identification of Plaintiff was made by a victim.

[26] As lead detective, McEnroe was responsible for determining what photo array should be utilized in connect with a warrant application. *See* Arroyo Dep. at 125:22-25.

suspect).   Second, despite Capone and Jasmine's identifications, the DNA results excluded Plaintiff as a DNA contributor to the samples recovered from the Victim.  *See id.* (noting that "an otherwise credible victim identification would not provide probable cause if police officers contemporaneously possessed reliable DNA evidence which determined conclusively that the accused could not have committed the crime").   McEnroe's affidavit entirely omitted this exculpatory evidence.  *See Wilson*, 212 F.3d at 790 (citation omitted) ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence[.]").  Thus, the weight given to the two witness identifications is limited.

Aside from the two witness identifications, the only other remotely inculpatory evidence in McEnroe's affidavit, as to Plaintiff, was that witnesses noted that one of the suspects had "beaten a murder rap" and Plaintiff had "beaten a murder rap" in Georgia.  Without any other evidence connecting Plaintiff to the Victim, The Doll House, or New Jersey, this fact would not "warrant a reasonable person to believe that an offense has been or is being committed by the person [Plaintiff] to be arrested."  *Wilson*, 212 F.3d at 789.  Moreover, McEnroe's two remaining probable cause arguments ((3) and (4) above), are smokescreens, obscuring a simple argument: that the inculpatory evidence against Jones strengthened the otherwise weak case against Plaintiff.  But these arguments are without reason, because missing from McEnroe's affidavit—and McEnroe's motion—is any evidence connecting Plaintiff to Jones.  Thus, aside from the fact that witnesses identified both Jones and Plaintiff in photo lineups, the Court will not infer a connection between the two individuals where one did not even remotely seem to exist.

In stark contrast, there are two exculpatory facts, known to McEnroe at the time he submitted his affidavit, that would have weighed heavily against a finding of probable cause.  First, Plaintiff did not match the description of "Big Red," the suspect he was painted to be.  Second, the

results of Plaintiff's DNA buccal swab excluded him as a match for the DNA found on the Victim. Had McEnroe's affidavit to the state judge included even one of these two facts, the facts and circumstances known to McEnroe would not have been sufficient "to warrant a prudent man in believing that [Plaintiff] had committed…an offense." *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) (quoting *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005)).

Therefore, based on the record before the Court, viewed in the light most favorable to Plaintiff, disputes of material fact preclude summary judgment in McEnroe's favor as to all claims that hinge on probable cause finding. Accordingly, McEnroe will be denied summary judgment on Count IV – False Arrest/Imprisonment, Count V – Malicious Prosecution, Count VI – Conspiracy, and Count X – Violation of the NJCRA.

2. *Disputes of material fact concerning probable cause preclude summary judgment in Hadley's favor*

Next, Hadley unconvincingly claims that he is entitled to summary judgment on the same claims as McEnroe, arguing that he was not sufficiently involved to violate any of Plaintiff's constitutional rights. First, Hadley argues, at most, that he conducted the photo lineup (inclusive of Plaintiff) in a negligent manner, which is not a violation of Plaintiff's constitutional rights. *See* Newark Mot. at 11-14. Second, Hadley essentially asserts that it was "McEnroe's investigation," not his, meaning that he, personally, could not have violated any of Plaintiff's constitutional rights; therefore, he is entitled to summary judgment. *See id.* at 15-19. A dispute of material fact as to Hadley's second assertion[27] precludes a finding of summary judgment in his favor.

To be liable, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs," thus if Hadley truly had no personal involvement in the arrest, detention, and

---

[27] As such, the Court need not address Hadley's photo lineup assertion.

prosecution of Plaintiff, then he would be entitled to summary judgment. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). However, personal involvement "can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* At a minimum, a reasonable jury could conclude that Hadley had actual knowledge that there was no probable cause to arrest, detain, and prosecute Plaintiff, yet acquiesced to what ultimately resulted in an innocent man being detained for six months.

Hadley claims that he "had very limited involvement in the matter[,]" and "was not assigned to, was not actively involved in, or responsible for conducting the investigation[.]" Newark Mot. at 18. But, when asked who assigned[28] Hadley to the Victim's investigation, Arroyo testified, "[i]t could have been [a] lieutenant, captain or deputy chief." Arroyo Dep. at 33:23-34:4. Based on Arroyo's testimony that Hadley was "assigned" to the Victim's investigation, a reasonable jury could conclude that Hadley was assigned to the Victim's investigation.

Next, Hadley's participation in several key moments leading up to Plaintiff's arrest, detention, and prosecution could lead a reasonable jury to infer that if there was no probable cause to take these actions against Plaintiff that Hadley was partially responsible. *See Evans v. City of Newark*, 2023 U.S. Dist. LEXIS 44340, at *51 (D.N.J. Mar. 16, 2013) (finding that a reasonable jury could "find that Tietjen and Hadley participated in or influenced [the decision to charge the plaintiff], as they were both present at the meeting and had knowledge of the investigation"). Hadley's first confirmed active involvement in the Victim's investigation was his presentation of

---

[28] Arroyo confirmed that even a one-day stint on an investigation is considered an "assignment." D.E. 169-30 ("Arroyo Dep.") at 34:-5-10.

the photo lineups (inclusive of Plaintiff) to Jasmine.  Thereafter, Hadley was the only person who traveled to Georgia on three separate occasions to investigate the Victim's murder with McEnroe.[29]

First, in September 2012, McEnroe and Hadley traveled from New Jersey to Georgia to personally collect Plaintiff's DNA buccal swab, and to speak with Plaintiff.  *See* McEnroe Dep. at 131:17-22,[30] 170:2-10,[31] 208:11-20.[32]   Second, in October 2012, McEnroe and Hadley traveled from New Jersey to Georgia to arrest,[33] and speak with, Plaintiff.  *See id.* at 130:4-12,[34] 131:17-22.  Third, in April 2013, McEnroe and Hadley traveled from New Jersey to Georgia to investigate Plaintiff's alibi.  *See id.* at 131:1-22.  Therefore, having been present and an active participant on these three trips to Georgia, a reasonable jury could conclude that Hadley was personally involved in the arrest, detention, and prosecution of Plaintiff, despite potentially lacking probable cause for any such actions.

Moreover, Hadley's position that he cannot be held liable if Plaintiff was arrested, detained, and prosecuted without probable cause because he "was not even remotely involved in [the preparation of McEnroe's affidavit,]" is unconvincing.  *See* Newark Mot. at 18.  In *Evans v. City of Newark*, the Court (McNulty, J.) concluded that "although [Tietjen and Hadley] did not draft

---

[29] McEnroe and Hadley took three trips from New Jersey to Georgia for the Victim's investigation. McEnroe Dep. at 122:5-10 ("The one time to collect the DNA, the second time to execute the arrest warrants, and the third time to investigate Mr. Fallen's alibi.").

[30] "Q.  You mentioned Detective Hadley.  Detective Hadley drove with you to Atlanta to execute the search warrant?  [McEnroe] A.  To execute the buckle search warrant, to execute the arrest warrants and to investigate the alibi."

[31] "[McEnroe] A.  The sole reason I went to Atlanta, sole reason, was to interview Mr. Fallen.  The sole reason I brought Mr. – Detective Hadley with me was the fact if he was uncomfortable talking to me, I had an African American officer who's very experienced, a very good interviewer, great detective who could, okay, you don't want to talk to this guy for whatever reason, talk to me."

[32] "[McEnroe] A….We're [McEnroe and Hadley] there to talk to him [Plaintiff].  Absolutely. That's the whole reason we drove down there, that's the whole reason Joe Hadley was there."

[33] On October 24, 2012, McEnroe and Hadley attempted to execute the arrest warrant on October 24, 2012, but were unsuccessful.  On October 25, 2012, Plaintiff ultimately turned himself in.

[34] "I [McEnroe] want to speak to all defendants, and that's why Joe Hadley is there."

the affidavit in support of [the plaintiff's] arrest warrant, a reasonable jury could nonetheless find that Tietjen and Hadley made a reckless omission[;]" therefore, summary judgment was denied. 2023 U.S. Dist. LEXIS 44340, at *54.  The Court (McNulty, J.) reasoned that a reasonable jury could find that Tietjen and Hadley knew the confession provided by the person who incriminated the plaintiff was fabricated, yet they failed to disclose this information at the plaintiff's charging conference; and as a result, when another officer prepared an affidavit in support of the plaintiff's arrest warrant, Tietjen and Hadley did not believe there was probable cause to arrest the plaintiff absent the fabricated confession.  *See id.* at *53-56.

Here, like in *Evans*, a reasonable jury could find that Hadley had information that would have made him believe there was no probable cause to arrest, detain, and prosecute Plaintiff. Specifically, on October 24, 2012, McEnroe and Hadley may have learned that Love confessed to being the second suspect, "Big Red," involved in the Victim's murder.  *See* D.E. 169-35 ¶ 25 (emphasis added) ("Please state when and how Defendants became aware that Brian Love was the second individual who was seen with Ms. Ramsey on the night she disappeared and when was the first time Defendants became aware of his involvement in her murder.  [Hadley] RESPONSE: Defendant Hadley became aware of this information when Mr. Love gave a statement in Georgia on *October 24, 2012* indicating his involvement in the murder of Ms. Ramsey."); Arroyo Dep. at 31:18-25 (emphasis added) (Arroyo acknowledging that McEnroe and Hadley learning of Love's involvement, on *October 24, 2012*, was communicated to him); *id.* at 44:2-15 (Arroyo acknowledging that Love gave a recorded statement, on October 24, 2012, concerning his involvement in the Victim's murder).  This was the same day that McEnroe and Hadley attempted to execute the arrest warrant on Plaintiff and one day before Plaintiff turned himself in.

Notably, Hadley merely provides that the record as to Love's October 24, 2012 statement is a "clerical error."  However, if Hadley knew that Love confessed to being the second suspect, "Big Red," before Plaintiff was arrested, yet failed to properly share this information, a reasonable jury could infer that Hadley knew Plaintiff's arrest, detention, and prosecution were without probable cause.  *See Evans*, 2023 U.S. Dist. LEXIS 44340, at *53-54 (finding that Hadley and Tietjen may be liable for an omission in another officer's affidavit, despite not having personally prepared the affidavit, because they did not share the information they knew).  Thus, because Hadley has not established that there is no dispute of material fact as to the timing and disclosure of Love's confession, this issue must be left for the jury, to determine whether probable cause existed to arrest, detain, and prosecute Plaintiff.

Accordingly, based on the record before the Court, viewed in the light most favorable to Plaintiff, disputes of material fact preclude summary judgment in favor of Hadley as to Count IV – False Arrest/Imprisonment, Count V – Malicious Prosecution, [35] Count VI – Conspiracy, [36] and Count X – Violation of the NJCRA.

---

[35] For purposes of the "malice" element necessary for Count V – Malicious Prosecution: "fact issues precluding a finding on probable cause will generally also preclude a finding on malice." *Sanders v. Jersey City*, 2021 U.S. Dist. LEXIS 78681, at *51 (D.N.J. Apr. 23, 2021) (citing *Bartlebaugh v. City of Camden*, 2007 U.S. Dist. LEXIS 91953, at *7 (D.N.J. Dec. 13, 2007)); *Evans*, 2023 U.S. Dist. LEXIS 44340, at *56 (finding that a reasonable jury could find that the officers acted with malice, if the jury concludes that probable cause did not exist to prosecute the plaintiff).

[36] For purposes of the "agreement" and "concerted action" elements necessary for Count VI – Conspiracy, the Court adheres to the following caution from the Third Circuit: "'an allegation of conspiracy can only be overcome at summary judgment when the moving parties' submissions foreclose the possibility of certain facts from which it would be open to a jury to infer from the circumstances that there had been a meeting of the minds.'" *Evans*, 2023 U.S. Dist. LEXIS 44340, at *58 (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018)).  Here, construing the evidence in Plaintiff's favor, a reasonable jury could infer an "agreement" and "concerted action" between McEnroe and Hadley, if the jury finds that they learned that Love was the second suspect, "Big Red," before Plaintiff was arrested.  *See id.* at *59 (concluding that "the

**C.  Qualified Immunity Will Be Denied**

Tied with the probable cause analysis, the Court cannot find that McEnroe and Hadley are entitled to qualified immunity.  "The burden of establishing entitlement to qualified immunity is on [McEnroe and Hadley]."  *Reedy*, 615 F.3d 197, 223 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 808 (1982)).  This doctrine "protects government officials 'from liability for civil suits insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).  "In the probable cause context, a police officer is entitled to qualified immunity 'if a reasonable officer could have believed that probable cause existed to arrest [Plaintiff].'"  *Halpin v. Gibson*, 2009 U.S. Dist. LEXIS 94599, at *4 (D.N.J. Oct. 9, 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

However, for the reasons detailed in the preceding section, *supra* Section III.B., when viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could infer that there was no probable cause to arrest, detain, and prosecute Plaintiff.  *See Reedy*, 615 F.3d at 224 (reversing district court's holding granting qualified immunity because, when viewed in the light most favorable to the plaintiff, there was no probable cause to issue an arrest warrant).  To name the most salient reasons from which a reasonable jury could draw this inference:  there was independent exculpatory evidence demonstrating that Plaintiff was six-to-eight inches shorter than the suspect and his DNA did not match the DNA found on the Victim; and if Love confessed, on October 24, 2012, then McEnroe and Hadley would have learned that the second suspect, "Big Red," was Love, not Plaintiff, one day before Plaintiff's arrest.  Thus, because there are disputes

---

circumstances [] suggest concerted action, as Carrega, Tietjen, and Hadley all failed to disclose to [the prosecutor] that Hampton's confession [incriminating Plaintiff] was falsified.").

of material fact as to whether probable cause existed, McEnroe and Hadley are not entitled to qualified immunity on Count IV – False Arrest/Imprisonment, Count V – Malicious Prosecution, Count VI – Conspiracy, and Count X – NJCRA.[37] *See Reedy*, 615 F.3d at 224 (concluding district court erred in finding qualified immunity applied given issues of fact as to probable cause remained); *Washington v. Detective*, 29 F.4th 93, 106 (2d Cir. 2022) (affirming district court's holding that disputed issues of material fact as to probable cause precluded qualified immunity finding at the summary judgment stage).

### D.  Summary Judgment Will Be Denied on Counts I and VII[38]

Newark is not entitled to summary judgment as to Count I – Pattern and Practice Liability and Count VII – Supervisor Liability,[39] to the extent these claims assert failure to train and failure to supervise theories of liability.  Dispositive of Counts I and VII against Newark are persisting disputes of material fact concerning whether Plaintiff's constitutional violations were caused by Newark's failure to train, supervise, and/or investigate.

Liability pursuant to 42 U.S.C. § 1983 may be imposed on a municipality for the constitutional violations of its employees if an "action pursuant to official municipal policy of some nature caused a constitutional tort" to be committed by such employees.  *Monell*, 436 U.S. at 691.  "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City*

---

[37] For the same reasons that Defendants are not entitled to qualified immunity, they are also not entitled to good faith immunity under the New Jersey Tort Claims Act.

[38] Mislabeled in the FAC as "Count VI."

[39] Both Counts I and VII are Section 1983 claims that "essentially piggy-back on other [Section] 1983 [claims asserted against Hadley,]" meaning that Newark can only be liable if Hadley is also liable for related underlying torts.  *See Waselik*, 2017 U.S. Dist. LEXIS 76646, at *11-12 (noting that municipal liability claims are not standalone claims, but rather are derivative claims seeking to hold a municipality liable for the underlying Section 1983 torts of its employees).  This prerequisite is satisfied because the Section 1983 claims against Hadley will proceed.

*of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (cleaned up).  However, a policy need not be official, as a municipality may be held liable where a plaintiff establishes that a custom or practice "although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

"One such custom is 'deliberate indifference' toward the class of persons who might suffer a constitutional injury as a result of the conduct in question." *Benham v. Borough of Highland Park*, 79 F. Supp. 3d 513, 521 (D.N.J. 2015) (citing *Simmons v. City of Phila.*, 947 F.2d 1042, 1070 (3d Cir. 1991)).  The deliberate indifference standard is demanding, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Bd. of the Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 407 (1997) (citations omitted) (noting a showing of simple or even heightened negligence will not suffice).

### 1. *Failure to train and failure to supervise*

Inadequate police training or supervision may serve as the basis for municipal liability, if the failure to train or supervise "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014).  For a failure to train claim, deliberate indifference can be established either by "a pattern of violations which puts the municipal employee on notice that a new program is necessary or a single incident violation where the need for training was patently obvious [to avoid a constitutional injury]." *Id.* at 223.  For a failure to supervise claim, deliberate indifference can be established by demonstrating that "supervisors had contemporaneous knowledge of the offending incident or of a 'prior pattern of similar incidents,'" and "the supervisors' action or inaction somehow

communicated approval of the offending behavior." *Tobin v. Badamo*, 78 F. App'x 217, 219 (3d Cir. 2003) (cleaned up).

Plaintiff provides that Newark's failure to train, instruct, supervise, and discipline subordinate officers, with respect to the reasonable suspicion and probable cause standards, establishes that Newark was deliberately indifferent to constitutional violations committed by its officers. *See* Newark Opp'n at 21-31. Specifically, by failing to train and supervise its officers, like Hadley, on these standards and their application, Newark was deliberately indifferent to the known risk that officer-citizen encounters had previously resulted in false arrests, unlawful imprisonments, and malicious prosecution, coverups, falsified documents, and excessive force. *See id.* at 26-29. Improper training and supervision on these two standards could foreseeably lead to violations of the Fourth Amendment, in that a person, like Plaintiff, could be arrested, detained, and prosecuted without probable cause.

The record sufficiently creates a dispute of material fact as to whether Newark acted with deliberate indifference by not properly training and supervising its officers on the reasonable suspicion and probable cause standards.

With respect to training, Hadley testified: he "didn't really" receive training concerning the determination of reasonable suspicion, D.E. 169-33 at 75:20-24; he received training concerning the determination of probable cause at the police academy, but did not recall additional training, *id.* at 76:4-17; and he received training concerning search and seizure at the police academy, *id.* at 76:18-20. Hadley was hired on October 16, 1989, meaning that his police academy training was completed 23 years before Plaintiff's arrest, despite a potential lack of probable cause for these actions. On this basis, a reasonable jury could infer that Newark is liable for failing to train its

officers on the reasonable suspicion and probable cause standards, thereby potentially leading to, *inter alia*, false arrests and malicious prosecutions.

With respect to supervision, Arroyo, who was the supervisor on the Victim's investigation, Arroyo Dep. at 43:7-10, testified: he was "pretty sure [he asked McEnroe whether he investigated Plaintiff's alibi before arresting him,]" *id.* at 35:21-25; McEnroe told him "that he had knowledge that Mr. Love was involved in the crime before he arrested Fallen," *id.* at 36:5-12; and he was "pretty sure [he asked McEnroe why he arrested Corey Fallen despite knowing that Love had admitted to being involved in the crime], but didn't "remember his response. But I definitely asked him why[,]" *id.* at 36:13-19; and he spoke only to "the lead investigator which was McEnroe[,]" not Hadley about why they effected Plaintiff's arrest despite Love's confession, *id.* at 37:11-38:2. Arroyo's testimony exhibits a level of uncertainty as to Plaintiff's involvement in the Victim's murder. From this, a reasonable jury could infer that Arroyo, at a minimum, had doubts as to whether Plaintiff was involved and his inaction led McEnroe and Hadley to go ahead and execute the arrest warrant on Plaintiff, despite potentially lacking probable cause.

Accordingly, Newark will be denied summary judgment as to Plaintiff's municipal liability claims, insofar as they are premised on a failure to train and failure to supervise.

### 2. *Failure to investigate*

Municipal liability can also be premised on a municipality's failure to investigate, such that this failure demonstrates deliberate indifference to the constitutional rights of persons with whom the police come in contact. *See Groman*, 47 F.3d at 637. But "[i]t is well-settled within the Third Circuit 'that an allegation of a failure to investigate, without another recognizable constitutional

right, is not sufficient to sustain a [S]ection 1983 claim.'" *Belt v. Fed. Bur. of Prisons*, 336 F.

Supp. 3d 428, 439 (D.N.J. Sept. 17, 2018) (citations omitted).  Plaintiff fails to raise a dispute of

material fact as to this theory of liability.

Specifically, Plaintiff claims that Newark had a custom of failing to adequately investigate

misconduct complaints.  *See* Newark Opp'n at 29-31.  For support, Plaintiff points only to

statistics: the Newark Police Department's Annual Internal Affairs reports, 2005 to 2017, noting

that approximately 14,009 Internal Affairs' investigations were reported to the Essex County

Prosecutor's Office, but that less than two percent of allegations involving complaints of criminal

misconduct by Newark officers were sustained, *see id.* at 30 (citing D.E. 169-45 at 61); and the

Department of Justice's investigation into the Newark Police Department, *see* FAC ¶ 117.

However, statistical evidence alone, "isolated and without further context," generally "may not

justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts

of police officers."  *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (citing

*Strauss v. City of Chicago*, 760 F.2d 765, 768-69 (7th Cir. 1985)).

Instead, if Plaintiff seeks to rely on statistics of prior complaints, he must show why those

complaints were wrongly decided and "how the misconduct in those cases is similar to that

involved in the present action."  *See Franks v. Cape May Cnty.*, 2010 U.S. Dist. LEXIS 93226, at

*34-35 (D.N.J. Sept. 8, 2010) (citations omitted).  One way to make this showing is to demonstrate

that Hadley, whom Plaintiff accuses of violating his Fourth Amendment rights, has been the

subject of multiple similar complaints in the past.  *See Beck v. City of Pittsburgh*, 89 F.3d 966, 975

(3d Cir. 1996).  Plaintiff does not make this showing, instead claiming that Newark did not produce

Internal Affairs files over during discovery.  *See* D.E. 169 at 29-30.  Newark responds that it did

provide these files to Plaintiff.  *See* D.E. 166 at 11 (citing D.E. 166-3, Ex. B).

Plaintiff has failed to tie his failure to investigate claim to any substantive evidence in the record that could support municipal liability. Therefore, Newark will be entitled to summary judgment as to Plaintiff's municipal liability claims, insofar as they are premised on a failure to investigate.

### E. Summary Judgment Will Be Granted on Count VIII

Newark is entitled to summary judgment on Count VIII – Negligent Hiring/Training/Retention.[40]  Specifically, as Newark notes, Newark Mot. at 36-37, the NJTCA governs tort claims against public entities, including municipalities. *See Waselik*, 2017 U.S. Dist. LEXIS 76646, at *14.  Because this claim is a common law tort, and not a constitutional claim, it can only proceed where a plaintiff complies with the NJTCA, which requires that a notice of claim be filed within ninety days and the suit within two years of the claim's accrual. *See* N.J.S.A. 59:8-8.

There is no evidence in the record evidencing compliance, nor does Plaintiff provide a response or justification for his failure to comply, with the NJTCA's notice requirement. Accordingly, summary judgment in Newark's favor on Count VIII – Negligent Hiring/Training/Retention will be granted.

### F. Summary Judgment Will Be Granted on Count IX

McEnroe and Hadley are entitled to summary judgment on Count IX – Negligent and Intentional Infliction of Emotional Distress.  Again, because the NJTCA governs common law tort claims for negligent infliction of emotional distress and intentional infliction of emotional distress,

---

[40] To the extent that Plaintiff attempts to advance a claim under Section 1983 in Count VIII – Negligent Hiring/Training/Retention against Newark separate from Count I – Pattern and Practice and Count VII – Supervisor Liability, this claim cannot be entertained because it duplicates Plaintiff's assertions in Counts I and VII.

Plaintiff was required, but failed, to comply with the NJTCA's notice requirements.  *See Forcella v. City of Ocean City*, 70 F. Supp. 2d 512, 514 (D.N.J. 1999) (applying NJTCA notice requirements to claims for negligent infliction of emotional distress and intentional infliction of emotional distress).

There is no evidence in the record evidencing compliance, nor does Plaintiff provide a response or justification for his failure to comply, with the NJTCA's notice requirement. Accordingly, summary judgment in McEnroe and Hadley's favor on Count IX – Negligent and Intentional Infliction of Emotional Distress will be granted.

### G.  Summary Judgment Will Be Denied on Count XI

McEnroe and Hadley are not entitled to summary judgment on Count XI – Punitive Damages.  The Court cannot rule out punitive damages for the surviving Section 1983 claims and the remaining NJCRA claims.

Punitive damages are available in Section 1983 claims where a plaintiff can demonstrate that a defendant had a malicious intent to deprive him of his constitutional rights or to do him other injury.  *Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 327 (D.N.J. 2021) (quoting *Carey v. Piphus*, 435 U.S. 247, 257 n.11 (1978) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Here, McEnroe and Hadley arrested and detained Plaintiff, an innocent man, and if a jury accepts the theory that this was done without probable cause, then an inference of malicious intent to deprive Plaintiff of his constitutional rights is plausible.  *See id.*

Likewise, because the NJCRA parallels Section 1983 and incorporates existing Section 1983 jurisprudence, then punitive damages may be available for Plaintiff's surviving state law claims.  *See Walker v. City of Newark*, 2020 U.S. Dist. LEXIS 115437, at *10-11 (D.N.J. July 1, 2020) (applying usual rule of parallel construction between Section 1983 and NJCRA, and

therefore, holding that the plaintiffs may pursue punitive damages against the defendants under the NJCRA).

Therefore, whether Plaintiff can establish that punitive damages are warranted is not to be decided at this pre-trial juncture. *See Barletta v. Golden Nugget Hotel Casino*, 580 F. Supp. 614, 620 (D.N.J. 1984) (denying summary judgment as to punitive damages where factual disputes raised by a false arrest claim remain unresolved). Accordingly, McEnroe and Hadley will be denied summary judgment on Count XI – Punitive Damages.

### H. Summary Judgment Will Be Granted on Count XII

Defendants are entitled to summary judgment on Count XII – *Per Quod*. A *per quod* claim is "a [derivative] claim for compensation for the loss of a spouse's companionship and services due to [the] defendant's harmful actions." *Walker*, 2023 U.S. Dist. LEXIS 85227, at *23 (quoting *Alberts v. Gaeckler*, 446 N.J. Super. 551, 565 (Law. Div. 2014)); *see also Worster-Sims v. Tropicana Entm't, Inc.*, 2016 U.S. Dist. LEXIS 121942, at *26 (D.N.J. Sept. 8, 2016) (explaining derivative nature of *per quod* claim). However, the NJTCA's notice requirements apply to *per quod* claims.

Here, there is no evidence in the record evidencing compliance, nor does Plaintiff's wife, Shantell Fallen, provide a response or justification for her failure to comply, with the NJTCA's notice requirement. *See* D.E. 148-5 (certification from Peter Ramos, who is responsible for custody of all notices of claim filed with the State of New Jersey, noting that no notices of claim have been filed by Shantell Fallen). Accordingly, Defendants will be granted summary judgment on Count XII – *Per Quod*.

### IV. CONCLUSION

For the reasons stated herein, Defendants motions for summary judgment will be **DENIED** *in part* and **GRANTED** *in part*.  The following summarizes the claims that will survive and those that will be dismissed: (1) Counts I and VII against Newark will survive, to the extent that they are not premised on a failure to investigate; (2) Counts II through VI and X against Newark will be **DISMISSED**; (3) Counts II and III against McEnroe and Hadley will be **DISMISSED** in ten (10) days, however, Plaintiff may file an objection in accordance with the accompanying Order; (4) Counts IV through VI and X against McEnroe and Hadley will survive; (5) Count VIII against Newark will be **DISMISSED**; (6) Count IX against McEnroe and Hadley will be **DISMISSED**; (7) Count XI against McEnroe and Hadley will survive; (8) Count XII against all Defendants will be **DISMISSED**; and (9) to the extent any claims are asserted as common law tort claims they will be **DISMISSED**.  An appropriate Order accompanies this Opinion.

Dated: June 22, 2023

_____

Evelyn Padin, U.S.D.J.